UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| CHRISTOPHER R. BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:19-cv-00082-JMS-DLP |
| | ) | |
| WEXFORD HEALTH IND. LLC., | ) | |
| SAMUEL BYRD, | ) | |
| KIMBERLY HOBSON, | ) | |
| MICHAEL A. MITCHEFF, | ) | |
| RICHARD BROWN, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON MEDICAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

For the reasons explained in this Entry, the medical defendants' motion for summary judgment, dkt. [74], is **granted in part and denied in part.**

## I.  Background

Plaintiff Christopher R. Bailey is a prisoner confined at all relevant times at the Wabash Valley Correctional Facility (Wabash Valley). He brings this 42 U.S.C. § 1983 civil rights action against defendants Wexford of Indiana, LLC (Wexford), Samuel Byrd, M.D. (Dr. Byrd), Michael A. Mitcheff, O.D. (Dr. Mitcheff), and Kimberly Hobson, Health Services Administrator (HSA) (together the Medical Defendants). He alleges that he injured his right knee and that he experienced severe pain for months. The treatment prescribed by Dr. Byrd did not relieve his pain and Mr. Bailey's requests for an MRI and renewed pain medication were denied for months. Dkt. 43 at 3 (Entry Screening Amended Complaint). He complained to HSA Hobson but she failed to take corrective action. *Id.* He further alleges that Wexford has a policy or practice of denying adequate medical treatment, including MRIs, for financial reasons. *Id.*

The Medical Defendants seek resolution of the claims against them through summary judgment. Dkt. [74]. Mr. Bailey responded, dkt. [83-84], and the Medical Defendants replied, dkt. [87]. The motion is ripe for resolution.

## II.  Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## III.  Discussion

### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Bailey as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Defendant Dr. Byrd is a physician licensed to practice medicine in the State of Indiana. During all relevant times, he was employed by Wexford and worked at Wabash Valley. Dkt. 76-1, ¶¶ 1-2 (Affidavit of Samuel Byrd, M.D.).

Defendant Dr. Mitcheff is a physician licensed to practice medicine in the State of Indiana. Dkt. 76-2, ¶ 1 (Affidavit of Michael A. Mitcheff, D.O.). Since July 2018, he has been employed by Wexford as the Regional Medical Director (RMD) for the State of Indiana. *Id.*, ¶ 2. As the RMD, Dr. Mitcheff rarely has direct patient interaction. *Id.*, ¶ 3. Dr. Mitcheff supervises medical care provided by site medical directors, responds to questions or issues from a site level or the Indiana Department of Correction (IDOC), and reviews requests for patients to receive off-site medical care. *Id.*

Defendant Hobson is a nurse licensed to practice in the State of Indiana. During all relevant times, she was employed by Wexford as the HSA at Wabash Valley. Dkt. 76-3, ¶¶ 1-2 (Affidavit of Kim Hobson, HSA). As the HSA, Ms. Hobson's job duties and responsibilities were primarily administrative in nature, and she rarely was involved in direct patient contact or care. *Id.*, ¶ 3. Ms. Hobson oversaw the provision of medical services at the facility, ensured compliance with IDOC Health Services Directives, served as a liaison between IDOC and medical staff, and also responded to requests for information and grievances on behalf of the medical department. *Id.*

On August 13, 2018, Mr. Bailey injured his right knee while lifting weights with his legs in the gym. Dkt. 76-4 at 27 (Mr. Bailey's Deposition). When his leg came down, it "went numb." *Id.* He could not put any pressure on it. *Id.* He had to ask for a wheelchair because he could not stand up. *Id.* That day, he was put on a lower range assignment and was given a low bunk. *Id.* at 29.

Mr. Bailey was taken to medical where he saw Dr. Byrd. *Id.* at 28. According to Dr. Byrd's treatment notes, Mr. Bailey said that he was performing knee extensions on a weight machine when he suddenly developed right lateral knee pain and was unable to straighten his leg. Dkt. 76-5 at 29; dkt. 76-1, ¶ 4. Mr. Bailey described his pain as "aching to throbbing" when just sitting in the wheelchair "but sharp with palpation of the knee or attempts to straighten knee completely." Dkt. 76-5 at 29. The "[o]nly alleviating factor at this point is sitting with knee at roughly 75 degrees." *Id.*

Dr. Byrd assessed Mr. Bailey's knee, having him perform a number of movements as well as palpating the area and testing his range of motion. Dr. Byrd also performed a McMurray's test which is used to determine if there may be a fracture, a torn muscle, or potential torn cartilage, versus simply a sprain or strain. Dkt. 76-1, ¶ 4. After Dr. Byrd's initial assessment, he was not able to definitively determine the extent of the injury. *Id.* He ordered an x-ray of the knee and provided a steroid Prednisone pack and a compression knee sleeve. *Id.*; dkt. 76-5 at 31.

Two days later, on August 15, 2018, Mr. Bailey filed a request for health care, reporting that his pain was still a 10/10 and wanting to know the results of the x-ray. Dkt. 2-1 at 2. On August 19, 2018, Mr. Bailey submitted another request for health care, stating that the pain in his knee was still bad, that the x-ray did not show anything, and asking for an MRI to see if anything in the knee was torn. Dkt. 2-1 at 3. Mr. Bailey was scheduled to see the doctor. *Id.*

Dr. Byrd saw Mr. Bailey on August 22, 2018. Dkt. 76-5 at 22. Dr. Byrd noted that the x-ray he ordered was negative. *Id.* Mr. Bailey continued to report significant pain and no relief from the Prednisone tablets. *Id*; dkt. 76-1, ¶ 5. Dr. Byrd ordered Mobic and Tylenol for pain relief and provided a cortisone injection of the knee. Dkt. 76-5 at 23, 28; dkt. 76-1, ¶ 5. The goal of the cortisone injection was to provide pain relief and hopefully promote increased healing of the

4

affected area. Dkt. 76-1, ¶ 5.

On August 24, 2018, Mr. Bailey submitted a request for health care directed to Dr. Byrd informing him that his pain had not gotten any better, the injection had not helped, and he could still not straighten his knee all the way. Dkt. 2-1 at 4. He asked to be sent to the hospital for an MRI. *Id.* He was scheduled to see Dr. Byrd. *Id.*

Dr. Byrd saw Mr. Bailey on September 5, 2018, a little more than three weeks after the injury. Dkt. 76-5 at 25-27. Mr. Bailey continued to describe his pain as "aching to throbbing" when just sitting in the wheelchair "but sharp with palpation of the knee or attempts to straighten knee completely." *Id.* Dr. Byrd noted that the x-ray was negative for signs of any fracture and showed no effusion (fluid on the knee) and that the steroid injection and prednisone were ineffective. Dkt. 76-1, ¶ 6.  Effusion would indicate a torn ligament. *Id.* There was no bruising or swelling of the knee upon visual inspection. *Id.* Dr. Byrd testified in his affidavit that he attempted to perform another McMurray test to determine the presence of a cartilage tear, but he could not complete the test due to Mr. Bailey's pain. *Id.* The medical record states, however, "McMurray's positive subjectively. It was difficult to even perform McMurray testing due to pain." Dkt. 76-5 at 26. Dr. Byrd noted some decreased passive range of motion to the right knee but nothing that was convincing regarding the potential for a torn ligament. *Id.* As such, Dr. Byrd's assessment remained knee joint pain. *Id.* He prescribed Acetaminophen 500 mgs and Mobic 15 mgs. Dkt. 76-1, ¶ 6. He submitted paperwork to have a "collegial discussion" with Dr. Mitcheff, the RMD, about Mr. Bailey's case to determine if a form of physical therapy was warranted. *Id.*; dkt. 76-2, ¶ 4; dkt. 76-5 at 27.

On September 11, 2018, Mr. Bailey submitted a request for health care reporting that he had been on crutches for four weeks and his knee was not any better. Dkt. 2-1 at 5. He asked again

to be sent to the hospital for an MRI. *Id.* He submitted another heath care request on September 18, 2018, after being on crutches for five weeks. Dkt. 2-1 at 6. Mr. Bailey asked to be sent to the hospital for an MRI. *Id.* The response dated September 19, 2018, stated, "Request for PT eval sent." *Id.*

Dr. Byrd and Dr. Mitcheff had a collegial discussion about Mr. Bailey's treatment options on or around September 21, 2018. Dkt. 76-2, ¶ 4. Dr. Mitcheff was aware that a recent x-ray was negative for any fractures and did not note any effusion. *Id.* At that point, Dr. Mitcheff recommended to Dr. Byrd that Mr. Bailey receive a home exercise plan that focused upon improving knee range of motion. It was his belief that ongoing conservative care was appropriate at that point, as it had only been a few weeks since the date of injury. *Id.*

On September 24, 2018, Mr. Bailey submitted a request for interview to Dr. Byrd, stating that he had been on crutches for six weeks, was not getting better, and he wanted to be sent to the hospital for an MRI because he wanted to get better. *Id.* at 7. On September 25, 2018, Mr. Bailey submitted a request for interview to Kimberly Hobson, stating that he had an injury to his knee and that Dr. Byrd said because there was no swelling "they won't let me go" to an outside hospital to get an MRI. *Id.* at 8. Mr. Bailey further stated that "[t]here is a serious problem with my knee." *Id.* A response dated October 9, 2018, stated, "Please see previous form." *Id.*

Dr. Byrd saw Mr. Bailey that same day, on September 25, 2018. Dr. Byrd had discussed an "alternative treatment plan" with the RMD, Dr. Mitcheff. Dkt. 76-1, ¶ 7. Dr. Byrd informed Mr. Bailey that the plan was to have him do six weeks of a home exercise plan (HEP), anti-inflammatories, and a knee brace and then reevaluate. Dkt. 76-5 at 19; dkt. 76-1, ¶ 7. Mr. Bailey continued to complain of significant pain and that "something serious had to have happened." Dkt. 76-5 at 19. Dr. Byrd noted that Mr. Bailey still had difficulty bearing weight on his right foot. Dkt.

76-1, ¶ 7.

Dr. Byrd noted that a prior x-ray was negative without effusion, thereby ruling out a fracture, and making a torn ligament less likely, but he decided to re-order the x-ray with further specificity in an attempt to rule out a potential stress fracture. *Id.* Dr. Byrd decided to provide another course of steroids with the hope that it would promote healing. *Id.* He encouraged Mr. Bailey not to rely so much on crutches and to use just one (1) crutch. *Id.* The repeat x-ray was completed that day, but it revealed no signs of a stress fracture. *Id.* Dr. Byrd continued the prescriptions for Mobic and Tylenol and advised Mr. Bailey that unless there was a change on his x-ray, he would have to do six weeks of the HEP and then they would reevaluate. *Id.*; dkt. 76-5 at 19-20.

On September 25, 2018, Mr. Bailey also sent a request for interview to Dr. Kuenzli saying that he had been on crutches for six weeks, there was something seriously wrong with his knee, and he believed he had a torn ligament, but he had been denied an MRI because there was no swelling. Dkt. 2-1 at 9. A response stated, "[y]ou have been seen by the MD, you are to do 6 weeks of HEP exercises and then reevaluated by the MD." *Id.*

On September 27, 2018, Mr. Bailey submitted a request for health care asking for the x-ray results. Dkt. 2-1 at 13. The response dated September 29, 2018, stated that the "x-ray was negative." *Id.*

On September 28, 2018, Mr. Bailey submitted another request for health care stating that his knee was "still in bad shape," he had been taking the medicine and doing the leg exercises, but he could still not put pressure on his whole foot. Dkt. 2-1 at 15. He again asked to be sent out for an MRI to determine if he had torn a muscle in his knee. *Id.* The response on September 30, 2018, was "MD ordered you to complete HEP X 6 weeks as ordered & to get off crutches per treatment

7

schedule." *Id.*

On October 17, 2018, Mr. Bailey submitted a request for health care informing Dr. Byrd that he had been trying to do the workouts but he could not stand up on his own due to the pain in his leg and he still could not walk on his right leg. Dkt. 2-1 at 21. He requested an MRI because there was "something seriously wrong" with his knee. *Id.*  The October 19, 2018, response was that "[o]rders were exercises X 6 wks, anti-inflammatories, knee brace X 6 wks, & then it will be reevaluated. It has only been 3 ½ weeks approx." *Id.*

On October 23, 2018, Mr. Bailey submitted a formal grievance asserting that he had filed three informal grievances on October 7, 2018, complaining that he had told medical that he cannot perform the prescribed workouts because he cannot put pressure on his foot, he had been using crutches for 10 weeks, was in serious pain and it hadn't gotten any better, and he had asked to be sent to a hospital for an MRI, but been denied. Dkt. 2-1 at 26. On November 9, 2018, Mr. Bailey sent a letter to Warden Brown informing him that he had a knee injury and had been waiting to be sent to the hospital for an MRI and although he had been very patient, he is "really hurt" and asking for the Warden's help. *Id.* at 1. A handwritten response indicated that because Mr. Bailey had already filed informal complaints and a grievance, "no further response [was] necessary at this time." *Id.*

Ms. Hobson was contacted by IDOC grievance specialist Tom Wellington regarding Mr. Bailey's October 23, 2018, grievance. Dkt. 76-3, ¶ 4 (Hobson Affidavit); dkt. 76-6 at 1, 3. After receiving this grievance, Ms. Hobson reviewed Mr. Bailey's medical records and summarized the treatment he had received, dating back to the initial date of the injury on August 3, 2018. Dkt. 76-3, ¶ 5; dkt. 76-6 at 3.  Ms. Hobson reported that Mr. Bailey had been seen by Dr. Byrd, received an x-ray that revealed no abnormality, and received an injection in the knee. *Id.* She further

reported that Dr. Byrd had requested physical therapy, but the RMD's recommendation was to provide a home exercise program and conservative onsite treatment. *Id.* She noted that on September 25, 2018, another x-ray revealed no abnormality, prednisone was ordered, and Mr. Bailey was encouraged to use the knee sleeve and crutches and continue on Tylenol. *Id.* She also noted that only Dr. Byrd could determine if an MRI was appropriate at the time of the grievance and he had not requested an MRI. *Id.* She stated, "your care has been appropriate." Dkt. 76-6 at 3. Mr. Wellington used this information to deny Mr. Bailey's grievance on November 16, 2018. Dkt. 2-1 at 30; dkt. 76-3, ¶ 6; dkt. 76-6 at 4.

Mr. Bailey testified in his deposition that he tried to do the home exercises for about three weeks, but because it hurt to put pressure on his foot and he couldn't straighten his knee, he could not do them. Dkt. 76-4 at 38-39. He further testified that the exercises did not benefit him at all. *Id.* at 39.

On November 4, 2018, Mr. Bailey submitted a health care request, stating that he had been on crutches for three months, was still in pain, had tried to do the exercises but his knee gave out every time he tried, and he really needed to have an MRI. Dkt. 2-1 at 27. He further stated, "I have been patient and doing what you asked and it is not working." *Id.*  The November 6 response indicated that Mr. Bailey had right knee pain with pressure, he felt pain when pressing his toes upward, and Dr. Byrd would be notified. *Id.*

Mr. Bailey next filed a request for health care on November 9, 2018. Dkt. 2-1 at 28. He reported that he was told that day that Dr. Byrd said he would not be sent out for an MRI. *Id.* Mr. Bailey said that he was seriously injured and was asking again to be sent out for an MRI. *Id.* Mr. Bailey was referred to the doctor. *Id.* On November 19, 2018, Mr. Bailey submitted a request for health care asking for a refill of Acetaminophen and Meloxicam, but the response was that there

was no order for those medications. Dkt. 2-1 at 29.

Mr. Bailey next saw Dr. Byrd on November 20, 2018. Dkt. 76-1, ¶ 8; dkt. 76-5 at 16. Dr. Bailey noted that the injury had occurred more than eight (8) weeks ago and that Mr. Bailey could still not bear weight on his right leg. Dkt. 76-5 at 16.[1] Mr. Bailey continued to complain of significant pain and that "something serious had to have happened." *Id.* Dr. Byrd noted that at the last visit, they had prescribed a six (6) week alternative treatment plan consisting of home exercises, anti-inflammatories, and a knee brace. *Id.* He also noted that the repeat x-ray was negative, the steroid injection was ineffective, and prednisone was ineffective. *Id.*

Dr. Byrd noted that Mr. Bailey's range of motion of the right knee was "slightly improved" but that he had lost some range of motion "to flexion and extension of the knee." *Id.*; dkt. 76-1, ¶ 8.  Mr. Bailey was walking with a cane as opposed to crutches. *Id.* Mr. Bailey had to walk on his tippy toes when he used the cane because it hurt to put pressure on his right foot. Dkt. 76-4 at 43. At this point Dr. Byrd believed his condition was consistent with patellar tendonitis. Dkt. 76-5 at 18; dkt. 76-1, ¶ 8.

Dr. Byrd testified in his affidavit that he was encouraged by "the improved condition," but symptoms still remained. Dkt. 76-1, ¶ 8. Dr. Bailey prescribed a home exercise plan specific to treatment of patellar tendonitis and advised him he should do these exercises as he was able, up to two (2) times per day. Dkt. 76-1, ¶ 8; dkt. 76-5 at 18. Dr. Byrd also ordered another steroid packet. *Id.*

Mr. Bailey did not see Dr. Byrd again until about two months later, on January 15, 2019. Dkt. 76-1, ¶ 9. Dr. Byrd's chart reflects that the injury "occurred more than three months now," dkt. 76-5 at 13, which was accurate, but it was in fact more than five (5) months after the injury

---

[1] The injury had actually occurred more than fourteen (14) weeks earlier. The eight (8) week mark was October 8, 2018.

occurred. Mr. Bailey was still complaining of significant pain. Dkt. 76-1, ¶ 9; dkt. 76-5 at 13.

Dr. Byrd's chart notes were essentially the same as the November appointment, with the exception that in January, Dr. Byrd noted that Mr. Bailey was able to bear weight but only "with significant pain." Dkt. 76-5 at 13. He further noted that Mr. Bailey had not been on any medications and Mr. Bailey requested pain medication. Dkt. 76-1, ¶ 9. Dr. Byrd prescribed Cymbalta, which is an FDA approved medication for treatment of chronic pain. *Id.* He believed it was appropriate for a patient who was suffering symptoms consistent with patellar tendonitis given the failure with Mobic. Dkt. 76-5 at 15; dkt. 76-1, ¶ 9. Dr. Byrd continued to note "slightly improved" range of motion, but Mr. Bailey had lost some range of motion in his flexion and extension of his knee. Dkt. 76-5 at 13; dkt. 76-1, ¶ 9. Dr. Byrd again noted that the repeat x-ray was negative, the steroid injection was ineffective, and prednisone was ineffective. *Id.* Dr. Byrd advised Mr. Bailey to continue his home exercise plan with the goal that it would continue to promote ongoing healing. Dkt. 76-1, ¶ 9.

Two months later, on March 12, 2019, Dr. Byrd saw Mr. Bailey again. Dkt. 76-1, ¶ 10; dkt. 76-5 at 10. Mr. Bailey was unable to tolerate Cymbalta for pain due to severe nausea. *Id.* They discussed his condition and his home exercise plan and Mr. Bailey reported the ongoing impact on his activities of daily living due to his pain. *Id.* He was unable to go to recreation, had to use a cane all the time, and walked with an obvious limp. *Id.* He had lost his job as a sanitation worker at the prison. Dkt. 76-5 at 10. A custody officer who was present confirmed these statements. *Id.*; dkt. 76-1, ¶ 10.  Dr. Byrd performed another McMurray test, which was more clearly positive this time, and given Mr. Bailey's symptoms, led him to believe there may be a tear of the medial meniscus. *Id.* Dr. Byrd noted that Mr. Bailey had failed all conservative measures. *Id.* He submitted a request for Mr. Bailey to receive an MRI to determine if there may be a torn ligament or meniscus in the

11

knee. Dkt. 76-1, ¶ 10; dkt. 76-5 at 12.

On or about March 29, 2019, Dr. Byrd submitted a request to Dr. Mitcheff for Mr. Bailey to receive an MRI of his knee. Dkt. 76-2, ¶ 5. Dr. Byrd indicated in the medical records that Mr. Bailey had ongoing right knee pain, performed several weeks of home exercises, and had been treated with anti-inflammatories and a knee brace, but continued to have pain. *Id.* Dr. Byrd had also ordered a repeat x-ray that did not have any significant findings. *Id.* After review of these records and discussion with Dr. Byrd, Dr. Mitcheff approved Mr. Bailey to receive an MRI of his right knee. *Id.*

On April 8, 2019, Mr. Bailey received an MRI of his right knee that showed a possible radial tear of the medial meniscus with an oblique tear of the anterior horn of the lateral meniscus and small joint effusion. Dkt. 76-1, ¶ 11; dkt. 76-5 at 7, 38. Dr. Byrd followed up with Mr. Bailey on April 12, 2019, to discuss the findings of the MRI. Given the findings of a confirmed oblique tear of the meniscus, Dr. Byrd submitted a request for Mr. Bailey to be referred to see an orthopedic specialist because those types of tears generally require surgery if conservative measures fail. Dkt. 76-1, ¶ 12; dkt. 76-5 at 7. After asking for some additional information, and after Dr. Byrd indicated that Mr. Bailey had been non-weight bearing for a period of about three (3) months, on April 29, 2019, Dr. Mitcheff approved the request to be seen by an orthopedic specialist. Dkt. 76-2, ¶ 6.

On May 6, 2019, Mr. Bailey saw orthopedic specialist Dr. Kurt Madsen, who determined that Mr. Bailey needed a right knee arthroscopy. Dkt. 76-1, ¶ 13; dkt. 76-5 at 39. Dr. Byrd submitted a request for right knee arthroscopy and continued the prescriptions for Tylenol and Mobic for pain. Dkt. 76-1, ¶ 14; dkt. 76-5 at 5-6. Dr. Mitcheff approved the request for the arthroscopy. Dkt. 76-2, ¶ 7.

Dr. Madsen performed the right knee arthroscopy on May 22, 2019. Dkt. 76-1, ¶ 15; dkt. 76-5 at 1-4. Afterward Mr. Bailey returned to the facility and was admitted to the institutional infirmary for follow up care. *Id.* He was given a prescription of Tramadol for pain and continued to have prescriptions for Tylenol and Mobic. *Id.*

Dr. Mitcheff approved follow up appointments with the surgeon and recommended in July 2019 that the nurse on-site educate Mr. Bailey regarding gait training with a recommendation that a cane only be used short term, to help promote increased mobility following surgery. Dkt. 76-2, ¶ 7.

Mr. Bailey had follow-up appointments with Dr. Madsen on June 5, 2019, July 15, 2019, and August 12, 2019. Dkt. 76-1, ¶ 17; dkt. 76-5 at 40-42. Following the last visit, he was referred for physical therapy and recommended to receive a hinged knee brace, and both were ordered. *Id.* After the surgery, Mr. Bailey used a cane for months and he still has some pain, but he is able to walk on it and has returned to a job requiring that he be on his feet. Dkt. 76-4 at 56-58.

Dr. Mitcheff never physically examined Mr. Bailey nor had any face-to-face interactions with him. Dkt. 76-2, ¶ 8. Dr. Mitcheff's only involvement with Mr. Bailey's care was as the RMD and was based upon his review of the medical records and conversations with Dr. Byrd. *Id.*

It is Dr. Mitcheff's opinion that there was not any improper or significant delay in Mr. Bailey receiving medical care. *Id.*, ¶ 10. It is his opinion that consistent with the applicable community standard of care, Mr. Bailey was given a thorough course of conservative measures which included pain medications, injections, assistive devices, and home exercises. *Id.* Once conservative measures failed, additional measures were ordered and approved. *Id.* Dr. Mitcheff believes the care and treatment was timely, thorough, appropriate, and consistent with the community standard of care. *Id.*, ¶ 12.

As a nurse, Ms. Hobson does not have the legal authority to diagnose a patient or order specific medical treatment. Dkt. 76-3, ¶ 9. In the case of Mr. Bailey, she did not have the authority to order an MRI or order that he be sent to an off-site hospital. *Id.* Ms. Hobson was carbon copied on a few e-mails regarding requests submitted by Dr. Byrd for Mr. Bailey to receive physical therapy, as well as an MRI and his surgical referral in 2019. *Id.* However, Ms. Hobson was not consulted regarding whether these actions were necessary, nor did she have the authority to approve or deny these requests. *Id.*

Mr. Bailey believed that Ms. Hobson was Dr. Byrd's "boss," and that she needed to approve his being sent to the hospital. Dkt. 76-4 at 17-18. He also assumed that because she was the HSA she had the authority to send him to the hospital. *Id.* at 18.

### B.  Analysis

Mr. Bailey was a convicted prisoner at all relevant times. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett,* 658 F.3d at 754. Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.*

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff,* 700 F.3d 1063, 1073 (7th Cir. 2012). The Court finds that there is no genuine issue of material fact as to whether Mr. Bailey's knee injury presented a serious medical condition. The dispositive issue is whether the defendants knew about Mr. Bailey's severe knee pain but disregarded that pain.

## 1.     Claim Against Dr. Byrd

Mr. Bailey is suing Dr. Byrd because Dr. Byrd's prescribed medications did not relieve his severe pain, trying to do exercises was painful, and for months despite his many requests, Dr. Byrd failed to refer him for an MRI or to see an outside specialist. Dkt. 76-4 at 14-17.

Mr. Bailey argues that the conservative treatment approach was extended far too long, causing him nine (9) moths of unnecessary and significant pain, and that he should have been provided an outside consultation and MRI immediately after he was injured. He contends that requiring him to try to do two rounds of home exercises knowing that they caused more pain also constituted deliberate indifference to his pain. Dr. Byrd responds that there was some initial improvement with the home exercise plan and that he then prescribed more specifically tailored exercises, but when it was clear that Mr. Bailey's condition had plateaued and was no longer improving and pain persisted, he ordered the MRI.

The Seventh Circuit has held that a prisoner may show deliberate indifference by showing that a medical provider persisted "in a course of treatment known to be ineffective." *Petties,* 836 F.3d at 729-730. Deliberate indifference may also be shown by "an inexplicable delay in treatment which serves no penological interest." *Id.* (citing cases); *see also Howell v. Wexford Health*

*Sources, Inc.*, No. 19-3210, _ F.3d _, 2021 WL 405006, at *3 (7th Cir. Feb. 5, 2021) ("Denying or delaying appropriate treatment to an incarcerated person suffering from avoidable pain can violate the Eighth Amendment."); *Miller v. Campanella*, 794 F. 3d 878, 880 (7th Cir. 2015); *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015) ("A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain."); *Gomez v. Randall,* 680 F.3d 859, 865-66 (7th Cir. 2012) (same); *Arnett*, 658 F.3d at 752 (same). "In some cases, even brief, unexplained delays in treatment may constitute deliberate indifference." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)).

"To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties,* 836 F.3d at 730-31. "Most importantly, the plaintiff must show that the defendant's actions or inaction caused the delay in his treatment." *Walker*, 940 F.3d at 964. "The receipt of some medical care does not automatically defeat a claim of deliberate indifference." *Perez,* 792 F.3d at 777 (internal quotation omitted).

Here, the record is undisputed that the "alternative treatment plan" prescribed by Dr. Byrd consisting of a compression knee sleeve, an anti-inflammatory (Mobic) and Tylenol, and exercises, was ineffective in reducing Mr. Bailey's pain or improving his ability to walk on his right leg. As of October 17, 2018, Dr. Byrd was aware that Mr. Bailey could not perform the exercises due to pain. He also knew that the anti-inflammatories were not reducing Mr. Bailey's severe pain. The six (6) week conservative treatment plan began on September 25, 2018, and thus should have ended November 6, 2018. And yet, on November 9, 2018, Dr. Byrd told Mr. Bailey that he would not be sent out for an MRI.

On or about November 20, 2018, it was Dr. Byrd's opinion that Mr. Bailey's condition had "slightly improved" with physical therapy. Dr. Byrd explains that because of that improvement a second home exercise plan was issued specific to his then diagnosis of patellar tendonitis. This opinion appears to have been based solely on a slightly improved range of motion of the right knee even though Dr. Byrd also noted some loss of range of motion to flexion and extension of the knee. At this time, Mr. Bailey's pain had not improved, and he still could not put weight on his right foot.

Dr. Byrd was not required to base his treatment decisions on Mr. Bailey's statements that he believed a muscle was torn and needed an MRI. Mr. Bailey is not a physician nor is he otherwise qualified to diagnose his injury. Dr. Byrd was required, however, to take into account the amount of pain that Mr. Bailey reported and the fact that his conservative treatment measures were ineffective across the board. At no time did Mr. Bailey report that any treatment alleviated his severe pain or allowed him to put weight on his right foot.

"Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, ... or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez*, 792 F.3d at 777 (internal citations omitted). It is Dr. Byrd's opinion that in cases like those presented by Mr. Bailey, the community standard of care will often require that a patient complete conservative measures, including medications, injections, and physical therapy. Dkt. 76-1, ¶ 19. But, for how long?

Mr. Bailey has presented pages from a medical treatise that discuss the "essentials of diagnosis" with respect to meniscus injuries. Dkt. 84-1 at 4. [2] The treatise states that a "patient

---

[2] For purposes of summary judgment, the Court accepts the passages Mr. Bailey has presented from medical texts as statements from a learned treatise that may be admitted under Federal Rule of Evidence 803(18). Mr. Bailey has not presented this evidence through an expert witness, but he

may or may not report an injury, joint line pain and pain with deep squatting are the most sensitive signs, and difficulty with knee extension suggests an internal derangement that should be evaluated *urgently* with MRI." *Id.* (emphasis added). "Physical findings can include effusion or joint line tenderness." *Id.* "Meniscus tears rarely lead to the immediate swelling that is commonly seen with fractures and ligament tears." *Id.* "Provocative tests, including the McMurray test, the modified McMurray test, and the Thessaly test, can be performed to confirm the diagnosis." *Id.* "Radiographs are usually normal but may show joint space narrowing, early osteoarthritis changes, or loose bodies." *Id.* "MRI of the knee is the best diagnostic tool for meniscal injuries." *Id.* It was documented that Mr. Bailey could not straighten his knee all the way on August 24, 2018, and there is no record that that ever changed before his surgery.

Dr. Byrd demonstrated his knowledge that the McMurray test was a proper means of confirming a diagnosis of a meniscus tear. He first performed that test on the date of the injury, but it was inconclusive. He tried to perform the test again about three (3) weeks later on September 5, 2018, and even though he could not complete it because of Mr. Bailey's severe pain, the chart reflects that it was "positive subjectively." Dr. Byrd ultimately relied on the McMurray test to diagnose the possible meniscus tear, but he fails to explain why he did not conduct the test again until *six (6)* months later, in mid-March 2019. Dr. Byrd knew that Mr. Bailey was in significant pain this entire time. Again, no prescribed treatment had improved Mr. Bailey's pain or ability to regain normal knee function.

Dr. Byrd testifies in his affidavit that he did not believe an MRI was required at an earlier

---

has "point[ed] to evidence that can be put in an admissible form at trial." *Marr v. Bank of America*, 662 F.3d 963, 966 (7th Cir. 2011). Moreover, the defendants have not challenged the admissibility of these passages.

time because the x-rays did not show signs of effusion (as he would expect if there were a torn ligament). Dkt. 76-1, ¶ 22. For injuries like Mr. Bailey's, however, x-ray results will be normal, and an MRI is the best diagnostic tool. Dkt. 84-1 at 4.

"While the cost of treatment is a factor in determining what constitutes adequate, minimum-level care, medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." *Petties,* 836 F.3d at 730. "[T]he dangers of delayed responses to medical requests are readily apparent." *Howell,* 2021 WL 405006, at *10. "Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms." *Perez*, 792 F.3d 777.

A reasonable jury could find that it was blatantly inappropriate for Dr. Byrd not to perform another McMurray test in early November 2018 after the first six (6) weeks of exercises failed to reduce Mr. Bailey's severe pain. A reasonable jury could further conclude that Dr. Byrd persisted in a course of treatment known to be ineffective; that is, continuing to prescribe the same conservative treatment for seven months while Mr. Bailey was in severe pain, knowing that x-rays do not reveal meniscus tears. Given these reasonable possibilities, as to the claim against Dr. Byrd, summary judgment must be denied.

### 2.      Claim Against Dr. Mitcheff

Mr. Bailey is suing Dr. Mitcheff because he did not send him to the hospital for treatment regarding his knee. Dkt. 76-4 at 21. Mr. Bailey argues that Dr. Mitcheff forced him to go through two (2) rounds of physical therapy knowing that an x-ray would not show a torn meniscus. As the RMD, Dr. Mitcheff was in a position to approve or deny a physician's request for offsite treatment and an MRI. As noted above, a reasonable jury could conclude that the failure to order an MRI sooner caused Mr. Bailey to suffer unnecessary pain for months.

Dr. Byrd spoke to Dr. Mitcheff on or about September 21, 2018. The medical records reflected that the McMurray test on September 5, 2018, was "positive subjectively." On September 21, 2018, almost six weeks after the injury, Mr. Bailey could not straighten his knee all the way, the x-rays were negative, and the cortisone injection, prednisone, and pain medications were ineffective. It is not surprising that Dr. Mitcheff believes that Mr. Bailey's treatment was timely and consistent with the community standard of care. The treatise standard of care, however, indicates that when a patient has difficulty with knee extension, the injury should be evaluated urgently with an MRI. A reasonable jury could conclude that knowing this history of the symptoms and treatment, Dr. Mitcheff's recommendation of exercises rather than an MRI was blatantly inappropriate.

It could be argued that Dr. Byrd did not ask Dr. Mitcheff to approve an MRI until March 29, 2019, but that still does not relieve Dr. Mitcheff of his obligation to prescribe appropriate diagnostic tools for a painful injury for which numerous treatments had failed. The Court acknowledges that the "collegial review process" of requiring an off-site physician to approve referral recommendations by on-site physicians "is not unconstitutional on its face." *Howell,* 2021 WL 405006, at *1. Nonetheless, a reasonable jury could conclude, based on this record, that Dr. Mitcheff directly caused the delay in diagnosis and treatment. Therefore, Dr. Mitcheff is not entitled to summary judgment.

### 3.    Claim Against Wexford

Although a private entity, Wexford acts under color of state law and therefore may be liable for violating Mr. Bailey's Eighth Amendment rights under the theory announced in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). *See Walker*, 940 F.3d at 966. "Prevailing on such a claim requires evidence that a Wexford policy, practice, or custom caused" the deliberate indifference.

20

*Id.* "It does not matter if the policy was duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

Mr. Bailey is suing Wexford because he believes that it hires people who don't care and don't take injuries seriously. Dkt. 76-4 at 26. He also alleges that Wexford has a practice or policy of failing to provide MRIs for financial reasons. Dkt. 43 at 3; dkt. 45 at 8-9.  He alleges that the "alternative treatment plan" was prescribed solely for the purpose of saving money because it was the least expensive treatment available.

Mr. Bailey cites to various sections of a Wexford Technical Proposal, which he obtained in discovery. *See* dkt. 73. The first sentence of the section on Offsite Specialty Care states, "Wexford's goal is to help the IDOC to avoid offender transport and offsite security costs." *Id.* at 89. On that same page, it states, "Wexford will make every effort to minimize offsite clinic trips." *Id.*

Recently in *Howell,* the Seventh Circuit acknowledged that if a reviewing physician had twice denied an on-site physician's request for outside ACL reconstruction surgery and insisted instead on physical therapy, "[i[t is not difficult to imagine how such denials might be deemed evidence of deliberate indifference. Howell says he was in pain, there is little evidence of a viable program of physical therapy to address his ACL tear, and avoiding surgery was likely to save money for Wexford and/or the State." *Howell,* 2021 WL 405006, at *9 (finding, however, no deliberate indifference on the part of Wexford because, unlike in this case, the denials were consistent with advice from outside surgeons).

The designated evidence presented by Mr. Bailey could lead a reasonable jury to conclude that Wexford policies or practices caused Dr. Byrd and Dr. Mitcheff to treat him with deliberate

indifference. A reasonable jury could also infer that Dr. Byrd's hesitance to request an MRI sooner was in large part due to his awareness that Wexford had a practice, even if not a written policy, of only approving MRIs as a last resort, due to the cost. Wexford is not entitled to summary judgment.

### 4.      Claim Against HSA Hobson

Mr. Bailey is suing Ms. Hobson because she responded to a grievance saying that the treatment he was receiving was appropriate and because he believed she was Dr. Byrd's boss and had the authority to send him to the hospital for an MRI but refused to do so. Dkt. 76-4 at 17-18. The undisputed record, however, reflects that Ms. Hobson was not, in fact, Dr. Byrd's boss, nor did she have the authority to recommend or approve an MRI or outside consultation. Ms. Hobson never directed nor interfered with Mr. Bailey's treatment. Her only involvement was to review his medical records and respond to a grievance on behalf of the medical staff.

There is no evidence that Ms. Hobson knowingly turned a blind eye to any inappropriate or harmful treatment by Dr. Byrd or other providers. *See e.g., Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."). As a member of the administrative staff, Ms. Hobson could defer to the medical providers' judgment as long as she was responsive to Mr. Bailey. *Id.* at 440 ("As a nonmedical administrator, Peterman was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate plaintiff].").

No reasonable jury could find that Ms. Hobson was deliberately indifferent to Mr. Bailey's knee injury. She is entitled to summary judgment in her favor.

### IV. Conclusion

For the reasons discussed above, the motion for summary judgment filed by the Medical Defendants, dkt. [74], is **granted in part and denied in part.** Summary judgment is **granted** in favor of HSA Hobson but **denied** as to the claims brought against Dr. Byrd, Dr. Mitcheff, and Wexford. No partial final judgment shall issue at this time.

The Magistrate Judge is requested to set this matter for a status conference to direct the further development of the claims against Dr. Byrd, Dr. Mitcheff, and Wexford. These claims will be resolved by settlement or trial.

**The clerk is directed to terminate** H.S.A. Kimberly Hobson as a defendant on the docket, as well as defendant Warden Richard Brown. *See* dkt. [94].

IT IS SO ORDERED.

Date: 2/16/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

CHRISTOPHER R. BAILEY
121747
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All electronically registered counsel

Magistrate Judge Doris L. Pryor